UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ANNA TEASLEY GERVAIT,<br><br>     Plaintiff,<br>v.<br><br>THE COCA-COLA COMPANY and THE COCA-COLA BENEFITS COMMITTEE,<br><br>     Defendants. | Civil Action File No.<br>_____<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

This is an action to recover benefits under an employee retirement plan governed by the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001, *et seq*. In her complaint, plaintiff alleges the following:

# INTRODUCTION

1.  Plaintiff Anna Teasley Gervait was married to Harry E. Teasley, Jr., a former executive of Defendant The Coca-Cola Company ("Coca-Cola"), when Mr. Teasley died in 2023. At that time, Mr. Teasley was receiving the retirement benefits he earned under the Coca-Cola Company Key Executive Retirement Plan (the "Executive Plan," attached hereto as **Exhibit 1**). Under the terms of The Executive Plan, Anna (as Mr. Teasley's spouse) is entitled to "a surviving spouse benefit under

#5136237v3

this Plan" equal to "100 percent" of the benefits Harry was receiving. Ex. 1 (Executive Plan) at 14, § 4.4(a).[1]

2.      Contrary to the language of the Executive Plan, Coca-Cola has wrongfully withheld these benefits, contending that, despite her marriage to Harry, Anna was not his "spouse" because she was not married to him when he first began to receive benefits years ago.

3.      But Coca-Cola, itself, interpreted the Executive Plan differently in 2011. That's when Harry was engaged to marry Anna and was making financial arrangements for their life together and for Anna's life should he predecease her. To that end, Harry asked Coca-Cola (through The Coca-Cola Company Benefits Committee (the "Benefits Committee")) whether Anna would receive the 100% spousal benefits after his death. Coca-Cola responded in writing that, if he were to marry Anna and die thereafter, Anna would be his "spouse at death" and thus "entitled to 100% of the benefit under the [Executive Plan]." A copy of the March, 2011 Correspondence is attached hereto as **Exhibit 2**, at 2.  Harry and Anna both relied on this interpretation of the Executive Plan when planning for their financial future, including, among other things, negotiating and executing a prenuptial agreement.

---

[1] Citations to page numbers in the exhibits refers to the page number generated by the CM/ECF system.

4. After Harry married Anna in 2011, Coca-Cola confirmed in writing that it considered Anna to be Harry's spouse under the Executive Plan. A true and correct copy of this December 20, 2011 correspondence is attached hereto as **Exhibit 3**.

5. Now, fifteen years later, Coca-Cola refuses to honor its obligations under the Executive Plan, insisting that the interpretation of the Executive Plan it shared with Harry and Anna was simply a mistake. Although the Executive Plan does not define "spouse," Coca-Cola now asserts that the term spouse can only mean the spouse at the time Harry commenced his benefits. Nothing in the Executive Plan, however, supports that interpretation.

6. Because Coca-Cola's denial of benefits to Anna is inconsistent with the terms of the Executive Plan and contrary to Coca-Cola's own interpretation of those terms, on which Harry and Anna reasonably relied, Anna brings this action to recover the benefits to which she is entitled.

## PARTIES

7. Anna Teasley Gervait is the widow of Harry E. Teasley, Jr. and a beneficiary under the Executive Plan pursuant to ERISA Section 3(8), 29 U.S.C. § 1002(8). Anna Teasley Gervait thus has standing to pursue claims under ERISA pursuant to 29 U.S.C. § 1132(a)(1)(B).

8. The Coca-Cola Company is a Delaware corporation with its principal place of business at One Coca-Cola Plaza, N.W., Atlanta, Georgia, 30313. At all

relevant times to this action, Coca-Cola has been an "employer" within the meaning of ERISA Section 3(5), 29 U.S.C. § 1002(5). Coca-Cola is also a "Plan Administrator" of the Executive Plan within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A) and pursuant to terms of the Executive Plan. Ex. 1 (Executive Plan) at 22.

9. The Coca-Cola Company Benefits Committee (the "Benefits Committee") is also (or in the alternative) a "Plan Administrator" of the Executive Plan within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A) and pursuant to the Executive Plan. Ex. 1 (Executive Plan) at 22–23; *id.* at 43 (amending the Executive Plan to appoint the Benefits Committee as the administrator of the Executive Plan).

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA, 29 U.S.C. § 1001, *et seq.*; ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1); and 28 U.S.C. § 1331.

11. Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Executive Plan was issued and administered in Atlanta Georgia and the Defendants reside in Atlanta, Georgia.

## BACKGROUND

**I.    Harry enrolled in the Executive Plan under which his surviving spouse is**

**entitled to 100% of his retirement benefit.**

12.  Harry Teasley was a devoted employee of Coca-Cola for over thirty years. He served as an executive with the company from 1973 until his retirement in 1996. During his time with Coca-Cola, Harry distinguished himself through his leadership, holding the title of President and CEO in four separate divisions including President of Coca Cola Foods and the joint venture Coca-Cola Nestlé, and was recognized for excellence in the performance of his duties.

13.  To plan for his retirement and the financial security of his spouse, Harry enrolled in two retirement plans: (1) the Executive Plan, offered to certain senior executives, and (2) the Employee Retirement Plan of the Coca-Cola Company (a/k/a "Qualified Pension Plan"), a tax-qualified plan available to all eligible employees. This case involves benefits under only the Executive Plan attached as Exhibit 1.

14.  The Executive Plan is a so called "top hat" plan, and therefore, its benefits are paid by the Coca-Cola Company.

15.  Section 4.4 of the Executive Plan provides that the "surviving spouse of a retired Participant who is receiving a benefit from the Qualified Pension Plan in the form of a 100 percent joint and surviving spouse payment and who dies while receiving … a benefit under Section 4.1 or 4.2 of this article, shall be eligible for a surviving spouse benefit under this Plan." Ex. 1 (Executive Plan) at 14 § 4.4(a).

16.  As Harry's retirement neared, he acknowledged his election to receive

benefits under the Qualified Pension Plan in the form of a 100 percent joint and surviving spouse payment.

17. Based on Harry's election, in a March 29, 1996 memorandum, the Committee memorialized its understanding that Harry was entitled to $29,580.19 a month for life under the Executive Plan "with a 100% survivor benefit for his spouse." A true and correct copy of this March 29, 1996 memorandum is attached hereto as **Exhibit 4**.

18. Thus, under the terms of the Executive Plan, upon his death, Harry's "spouse" is entitled to a "surviving spouse benefit" equal to 100% of the benefit Harry would receive under the Executive Plan (*i.e.*, $29,580.19 per month until the spouse's death).

19. Harry retired from The Coca-Cola Company on March 31, 1996 and then began receiving benefits under both the Qualified Benefit Plan and the Executive Plan in the form of 100 percent joint and surviving spouse payment. At that time, Harry was married to Linda Teasley.

20. On March 4, 2008, Linda Teasley passed away.

II. **Coca-Cola confirms that upon Harry's marriage to Anna, his spouse is entitled to 100% of the Executive Plan's benefits if she survives him.**

21. In February 2011, Harry was engaged to marry Anna Gervait. As soon as they were engaged, Harry began to plan for their life together and for Anna's life should Harry predecease her.

22. In particular, Harry wanted to ensure that his soon-to-be spouse would be taken care of after his death. To that end, he contacted Coca-Cola to confirm his understanding that, if Anna were to be his spouse upon his death, she would be entitled to 100% spousal benefits under the Executive Plan.

23. On March 17, 2011, Julie Bellem, the "GBS HR Operations Executive Services Manager" for Coca-Cola and Defendants' authorized agent, responded to Harry's request. *See* Ex. 2 at 2.

24. In her response, Ms. Bellem unambiguously stated that, if Harry were to be married to Anna at the time of his death, Anna would be his surviving spouse under this Executive Plan. In particular, Ms. Bellem considered the 1996 election of benefits form as well as Harry's Plan documents and confirmed by email that Harry's "spouse at death is entitled to 100% of the benefit under the Key [Executive] Plan." *Id.*

25. Ms. Bellem contrasted Anna's benefits under the Executive Plan with what Anna could expect under the Qualified Pension Plan, under which, Ms. Bellem explained, the "designated beneficiary on the Benefit Commencement Date is the only beneficiary," so Harry's "new spouse [would] not receive a benefit" under *that* Plan. *Id.*

26. Harry and Anna relied on Coca-Cola's interpretation of the Executive Plan when planning for their financial future. Among other things, they negotiated

and executed a prenuptial agreement based on Coca-Cola's representation that Anna would receive benefits under the Executive Plan if Harry predeceased her. For example, the two soon-to-be spouses agreed that Harry would not purchase an additional life insurance policy because Harry and Anna both understood and, based on Ms. Bellem's communications, were confident in the fact that Anna would receive substantial monthly pension benefits from the Executive Plan should Harry die during their marriage.

27. Harry married Anna on October 22, 2011.

28. Within a week of his marriage, Harry reached out to Ms. Bellem to ask what, if anything, he needed to do to add Anna as a spouse to the Executive Plan.

29. Ms. Bellem collected from Harry additional information about Anna, and then on December 20, 2011, Ms. Bellem confirmed that Anna was indeed added as a beneficiary of the Executive Plan. In particular, in response to Harry's December 20 request to "confirm[] that my wife, Anna, is covered by key retirement plan," Ms. Bellem "confirm[ed] that Merrill Lynch has processed this request" and that "Anna's information is in their system." *See* Ex. 3 at 2.

30. About 12 years later, on October 9, 2023, Harry passed away.

### III. After many delays, Coca-Cola refuses to provide Anna the benefits to which she is entitled.

31. On October 18, 2023, Anna sent a letter to Coca-Cola to provide documentation of Harry's death requested by Coca-Cola for her benefits under the

Executive Plan.

32. On November 6, 2023, having not received the monthly payment under the Executive Plan, Anna contacted a Coca-Cola human resources customer care specialist named Maria F. Peña. On November 8, 2023, Ms. Peña called Anna and orally confirmed that Anna would receive her Executive Plan benefits soon (*i.e.* her monthly payment).

33. By early December, however, Anna still had not received any benefits under the Executive Plan or any update from Coca-Cola.

34. Believing the delay to be the result of an administrative delay and seeking to break the log jam, Anna pressed Coca-Cola for information regarding her benefits. But then, on December 15, 2023, she received an email from a different human resources customer care specialist who stated, without further elaboration, that she was not entitled to benefits under the Executive Plan because "[Harry Teasley] had already commenced benefits (1/1/2008) and elected a beneficiary for benefit. Mr. Teasley's beneficiary for his [Executive Plan] was a first wife who predeceased him." A true and correct copy of this email is attached hereto as **Exhibit 5**.

35. Anna retained counsel who requested additional information about Coca-Cola's apparent denial of her benefits and copies of any record Coca-Cola considered in reaching its decision to deny benefits.

9

36. Coca-Cola responded by again denying Anna the benefits to which she was entitled. Coca-Cola also confirmed that it considered only two documents when denying Anna's request for benefits: the Executive Plan and a January 1, 2020 version of the Qualified Pension Plan.

37. Anna appealed that decision to the Benefits Committee in June 2024. In response, Coca-Cola acknowledged its general obligation to provide a final decision within 60 days of receipt of the appeal, but Coca-Cola said it needed more time to reach a final decision.

38. Finally, on September 25, 2024, nearly a year after Harry died, the Benefits Committee issued its final decision denying Anna the benefits to which she is entitled and claiming that its 2011 representations about the Executive Plan were simply "incorrect."

### COUNT 1
### Claim for Benefits Under the Terms of the Executive Plan

39. Anna incorporates paragraphs 1–38 as if fully set forth herein.

40. Under the Executive Plan, Anna, as Harry's spouse at the time of his death, is entitled to 100% spousal benefits.

41. Defendants have wrongfully refused to provide the benefits to which Anna is entitled.

42. Anna is entitled to recover those benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

# COUNT 2
## Claim for Benefits Based Upon Equitable Estoppel
### (in the alternative)

43. Anna incorporates paragraphs 1–38 as if fully set forth herein.

44. If this Court does not find for Anna on Count 1, the Court should find for Anna based on estoppel for the reasons set forth in this Count 2.

45. The Executive Plan is at least ambiguous as to eligibility for spousal benefits—the Plan is capable of more than one reasonable interpretation on this issue.

46. The provisions of the Executive Plan relating to spousal benefits must be construed in accordance with Coca-Cola's 2011 interpretation of ambiguous terms of the Executive Plan.

47. In its March 17, 2011 written communication to Harry, Defendants represented to Harry that his spouse at the time of his death would be entitled to 100% spousal benefits under the Executive Plan.

48. In its December 20, 2011 written communication to Harry, Defendants confirmed that Anna, as Harry's spouse, was the beneficiary under the Executive Plan and was in Coca-Cola's and Merryl Lynch's systems as such.

49. At the time Defendants made these representations, Defendants had access to the Executive Plan and the Qualified Pension Plan and were aware of the terms in those plans. Thus, Defendants' response to Harry's inquiries were

11

interpretations of those Plans.

50. Defendants knew or at least had reason to know that Harry would rely on Defendants' representations about the Executive Plan at the time Defendants made those representations.

51. Defendants also knew or at least had reason to know that Harry's fiancée at the time of its March 2011 communication, Anna, would rely on Defendants' representations about the Executive Plan at the time Defendants made those representations.

52. Defendants also knew or at least had reason to know that Harry's spouse at the time of its December 2011 communication, Anna, would rely on Defendants' representations about the Executive Plan at the time Defendants made those representations.

53. Harry and Anna reasonably and detrimentally relied on Defendants' representations regarding the terms of the Executive Plan when making Harry's decisions regarding the planning for the financial security of Anna, including in their negotiating and executing a prenuptial agreement and in Harry's decisions regarding life insurance.

54. Defendants are therefore estopped from disputing that the Executive Plan grants Anna 100% spousal benefits.

**WHEREFORE**, Anna Teasley Gervait prays:

A) That judgment be entered against Defendants and in favor of Plaintiff in an amount equal to benefits she should have received under the Executive Plan from the date of Harry's death through the date of the judgment, plus prejudgment interest;

B) That this Court order Defendants to comply with their obligations under the Executive Plan to provide the 100% spousal benefits to which Anna is entitled for the duration of her life;

C) That this Court enter judgment that Defendants are estopped from contradicting their 2011 interpretation of the spousal benefits under the Executive Plan;

D) That Plaintiff be awarded reasonable attorney fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and

E) That this Court grant such additional and further relief as it deems just and proper.

Dated this 16th day of May, 2025.

Respectfully submitted,

*/s/ David G.H. Brackett*

_____
David G.H. Brackett
Georgia Bar No. 068353
Michael R. Baumrind
Georgia Bar No. 960296
BONDURANT, MIXSON AND
ELMORE, LLP

13

One Atlanta Center
1201 West Peachtree Street, NW
Suite 3900
Atlanta, Georgia 3039
T: 404-881-4100
F: 404-881-4111
brackett@bmelaw.com
baumrind@bmelaw.com
*Attorneys for Plaintiff Anna Teasley Gervait*

14