IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ANNA TEASLEY GERVAIT, | |
| *Plaintiff,* | |
| *v.* | Case No.  1:25-cv-02738-TRJ |
| THE COCA-COLA COMPANY and THE COCA-COLA BENEFITS COMMITTEE, | ORAL ARGUMENT REQUESTED |
| *Defendants.* | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

Darren A. Shuler
Georgia Bar No. 644276
dshuler@kslaw.com
Elliott Foote
Georgia Bar No. 562482
efoote@kslaw.com

KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, GA 30309-3521
T: 404-572-4600
F: 404-572-5100

*Counsel for Defendants The Coca-Cola Company and The Coca-Cola Benefits Committee*

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    I.    The Executive Plan and the Pension Plan Should Be Construed Together Consistent with their Terms and the Ordinary Rules of Contract Interpretation. .......................................................................2

    II.    Plaintiff's Interpretation Conflicts with the Pension Plan and Other Provisions of the Executive Plan. ...............................................8

    III.    The Unambiguous Terms of the Executive Plan Foreclose Plaintiff's Equitable Estoppel Claim, and Her Reliance on a Stray Email Cannot Override the Committee's Discretion.................12

CONCLUSION .....................................................................................................15

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alday v. Container Corp. of America*,
     906 F.2d 660 (11th Cir. 1990) ...............................................................6

*Alexander v. Primerica Holdings, Inc.*,
     967 F.2d 90 (3d Cir. 1992) ...................................................................5

*Chiles v. Ceridian Corp.*,
     95 F.3d 1505 (10th Cir. 1996) ..............................................................6

*Comrie v. IPSCO, Inc.*,
     636 F.3d 839 (7th Cir. 2011) ................................................................5

*Gonzales v. Unum Life Ins. Co. of Am.*,
     861 F. Supp. 2d 1099 (S.D. Cal. 2012) ...........................................6, 7

*Gross v. Sun Life Assur. Co. of Canada*,
     734 F.3d 1 (1st Cir. 2013) .....................................................................5

*Holloman v. Mail-Well Corp.*,
     443 F.3d 832 (11th Cir. 2006) ...........................................11, 12, 15

*House v. Am. United Life Ins. Co.*,
     499 F.3d 443 (5th Cir. 2007) ................................................................5

*Hyman v. Nationwide Mut. Fire Ins. Co.*,
     304 F.3d 1179 (11th Cir. 2002) ...........................................................7

*Johnson v. Am. United Life Ins. Co.*,
     716 F.3d 813 (4th Cir. 2013) ................................................................5

*Kane v. Aetna Life Ins.*,
     893 F.2d 1283 (11th Cir. 1990) .........................................................14

*Katz v. Comprehensive Plan of Grp. Ins.*,
     197 F.3d 1084 (11th Cir. 1999) .........................................................15

*Klaas v. Allstate Ins. Co.*,
    21 F.4th 759 (11th Cir. 2021) ...........................................................................6, 15

*National Companies Health Ben. Plan v. St. Joseph's Hosp. of
    Atlanta, Inc.*,
    929 F.2d 1558 (11th Cir. 1991) ..........................................................................14

*Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*,
    644 F.3d 427 (D.C. Cir. 2011) ...............................................................................7

*Romano v. John Hancock Life Ins. Co. (USA)*,
    120 F.4th 729 (11th Cir. 2024) ..............................................................................9

*Vaught v. Scottsdale Healthcare Corp. Health Plan*,
    546 F.3d 620 (9th Cir. 2008) .................................................................................7

*Welch v. Unum Life Ins. Co. of Am.*,
    382 F.3d 1078 (10th Cir. 2004) .............................................................................7

*White v. The Coca-Cola Co.*,
    542 F.3d 848 (11th Cir. 2008) .............................................................................13

## **INTRODUCTION**

Defendants moved to dismiss Plaintiff's Complaint because her claim for a "Surviving Spouse" benefit fails under the unambiguous terms of the Executive Plan and the Pension Plan that it was designed and drafted to supplement. Plaintiff's Opposition does not confront this reality head on. Instead, Plaintiff seeks to obfuscate the relationship between the Executive Plan and the Pension Plan and avoid the application of their clear terms. Plaintiff's alternative estoppel claim—that a 2011 email from a Coca-Cola human resources employee trumps the terms of the Executive Plan and overrides the Benefits Committee's discretion to interpret those terms—is likewise unavailing.

Defendants' Motion should be granted for three independent reasons. First, by its plain terms, the Executive Plan is a supplement to Coca-Cola's Pension Plan, which predates the Executive Plan and expressly informs the Surviving Spouse benefit that is provided therein. Second, Plaintiff's proposed interpretation of the Executive Plan not only contradicts the Pension Plan—it also conflicts with the terms of the Executive Plan and has practical implications that extend far beyond this case. Third, Plaintiff's estoppel claim fails under the unambiguous terms of the Executive Plan, and her bid to override the Benefits Committee's discretion by mischaracterizing a stray email from a human resources employee should be rejected.

1

# ARGUMENT

## I.    The Executive Plan and the Pension Plan Should Be Construed Together Consistent with their Terms and the Ordinary Rules of Contract Interpretation.

Plaintiff's Opposition seeks to decouple the Executive Plan from the incorporated terms of Coca-Cola's Pension Plan, asserting they are "vastly different plans with different goals governed by different rules." Dkt. 17 ("Opp.") at 11–12. Plaintiff even goes so far to suggest that the Pension Plan did not exist until 2020, "nearly forty years after the effective date of the Executive Plan (January 1, 1984)." Opp. at 13.

But these assertions are not only demonstrably false—they are contradicted by Plaintiff's own allegations. *See* Compl. ¶¶ 12–13 (alleging that at the time of his retirement in 1996 Mr. Teasley was enrolled in the Pension Plan and acknowledging that it was then known as "the Employee Retirement Plan of the Coca-Cola Company"). In truth, the Pension Plan has always been Coca-Cola's primary retirement plan, and it predates the Executive Plan by more than thirty years. *See generally* Dkt. 8-2 at 18–19 (Article 1.1 "History and Background of the Plan"). Indeed, as one might expect for a company that was founded in the 1880s, Coca-Cola's Pension Plan has been amended, consolidated, and renamed numerous times. And the terms of both the Pension Plan and the Executive Plan make this clear.

2

The Introduction to the Pension Plan explains that the Plan's earliest predecessor "was originally effective July 1, 1948, and was amended from time to time thereafter." Dkt. 8-2 at 19 (Article 1.1(d)). The Pension Plan also notes that this predecessor was referred to as the "Employee Retirement Plan of The Coca-Cola Company" (as Plaintiff's Complaint acknowledges) until 2010. *Id.* at 107; Compl. ¶ 13. The Pension Plan further explains that, in 2013, this predecessor was merged with two other retirement plans and became known as the Pension Plan. Dkt. 8-2 at 18 (Article 1.1(b)). The Pension Plan makes clear that it was intended as "the continuation" of these three prior plans "renamed as The Coca-Cola Company Pension Plan." *Id.* at 19–20 (Article 1.2(a)-(b)). As a continuation, "[e]mployees who were participating in" the merged plans would "continue to be eligible to accrue pension benefits using the formula previously set forth" in those plans, which are reflected in various schedules to the Pension Plan. *Id.* at 20 (Article 1.2(b)(2)). In short, the Pension Plan is the successor to the plan under which Mr. Teasley began receiving benefits after he retired in 1996—the Employee Retirement Plan of The Coca-Cola Company. Compl. ¶ 13.[1]

---

[1] Defendants attached the 2020 Pension Plan document to their Motion because that was the version in effect when Plaintiff initiated her claim for a Surviving Spouse benefit in 2024—a fact that is also acknowledged in the Complaint. *See* Compl. ¶ 36.

The Executive Plan confirms this history, defining references to "Qualified Pension Plan" as the "Employee Retirement Plan of The Coca-Cola Company" (i.e., the earlier name of the Pension Plan that was in use when the Executive Plan was adopted in 1984). Dkt. 1-1 at 9 (§ 2.1(o)). By its express terms, the Executive Plan's purpose is to "supplement the benefits payable from [Coca-Cola]'s Qualified Pension Plan." *Id.* at 7 (§ 1.2); *see also id.* at 9 (§2.1(m), defining the "Plan" as "the supplemental retirement plan described in this instrument"). Indeed, the eligibility for and the amount, commencement, and duration of benefits under the Executive Plan are all defined with express reference to the terms of the Pension Plan. *Id.* at 12 (§ 4.1(b)–(c)). Specifically, Section 4.1(b) of the Executive Plan calculates benefits as the greater of two options over the "monthly normal retirement benefit [the participant] would have been entitled to receive . . . under the Qualified Pension Plan, but for the provisions of [the Internal Revenue] Code" limiting the benefits that can be provided under tax-qualified plans. *Id.* And Section 4.1(c) provides that these supplemental benefits from the Executive Plan are payable "at the same time as the normal retirement benefit payable from the Qualified Pension Plan." *Id.* Eligibility for and the amount of the "Surviving Spouse" benefit that Plaintiff seeks in this case is likewise determined with express reference to the benefits provided under the terms of the Pension Plan. *Id.* at 14 (§ 4.4(a)–(b)).

The Executive Plan's express incorporation of the Pension Plan's key terms and benefit structure is not unusual.  Indeed, so-called "top hat" plans (like the Executive Plan) are typically drafted on top of a "tax-qualified" plan (like the Pension Plan)—and this is because a top hat plan's very *raison d'être* is to provide the supplemental benefits that would otherwise be due to highly compensated executives, but that cannot be provided under a tax-qualified plan.  *See Comrie v. IPSCO, Inc.*, 636 F.3d 839, 840 (7th Cir. 2011) (recognizing top hat plans are meant to provide additional "benefits exceeding those eligible for tax deferral under the Internal Revenue Code").

Here, the Executive Plan unambiguously says that is its purpose and goes on to expressly incorporate the key terms of the Pension Plan.  Thus, the two documents should be construed together and in a consistent fashion.  *See Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 8 (1st Cir. 2013) ("A 'plan' under ERISA may embrace one or more policies[.]"); *House v. Am. United Life Ins. Co*., 499 F.3d 443, 452 (5th Cir. 2007) (interpreting two plans together where "[t]he policy contemplates and establishes a single plan.").  And, in accordance with the normal rules of contract interpretation, this Court should read the plans together, seeking to give effect to every provision and avoid conflicts. *Alexander v. Primerica Holdings, Inc*., 967 F.2d 90, 93 (3d Cir. 1992) ("ERISA plans, like contracts, are to be construed as a whole."); *see also Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813,

5

820 (4th Cir. 2013) ("[B]ecause contracts are construed as a whole, courts should seek to give effect to every provision in an ERISA plan, avoiding any interpretation that renders a particular provision superfluous or meaningless.").[2]

Contrary to Plaintiff's assertion, there is no "extrinsic evidence" being applied to understand the meaning of the "Surviving Spouse" benefit provided under the Executive Plan. *See* Opp. at 11.[3]  Instead, this phrase has the same meaning provided in the Pension Plan (which is expressly, and repeatedly, referenced in the Executive Plan as the document that describes who is entitled to the supplemental benefits provided under the Executive Plan and how those benefits are calculated, when they commence, and the duration they are paid): Surviving Spouse is the person who "was

---

[2] The case law cited in Plaintiff's Opposition does not hold otherwise. *See Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) (declining to read four ERISA plan documents that related to distinct healthcare and disability benefit plans as a single plan because, unlike here, the plans did not expressly supplement or incorporate each other's terms such that "it [was] clear from the language of the plan documents that the company intended to establish four different plans").  Plaintiff's state-law contract cases, *Patel* and *Newell Recycling*, are similarly inapposite—both addressed whether extrinsic documents executed long after a contract can provide the critical element of contemporaneous consideration.  Neither case precludes this Court from construing plan documents together when interpreting eligibility for benefits under an ERISA plan, particularly where one incorporates the terms of another.  *See Gonzales v. Unum Life Ins. Co. of Am.*, 861 F. Supp. 2d 1099, 1107 (S.D. Cal. 2012) ("A plan may incorporate other formal or informal documents, such as a collective bargaining agreement or a certificate of insurance.").

[3] This case is readily distinguishable from *Alday v. Container Corp. of America*, 906 F.2d 660, 666 (11th Cir. 1990) and *Klaas v. Allstate Ins. Co.*, 21 F.4th 759, 768 (11th Cir. 2021), which both declined to consider informal communications (actual extrinsic evidence) to interpret the terms of an ERISA plan.

married to a Participant on the Participant's Benefit Commencement Date" and
"[t]he Participant's Spouse as of the Participant's Benefit Commencement Date shall
continue to be the Participant's Spouse . . . notwithstanding the subsequent death or
divorce of such Spouse and the remarriage of the Participant."  Dkt. 8-2 at 34–35;
*see Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 434 (D.C. Cir.
2011) ("Far from suggesting that one plan document must contain all the legally
relevant terms and language, the statutory text [of ERISA] clearly contemplates
multiple relevant documents. Other circuit courts that have considered this question
have also generally concluded that multiple plan documents are legally relevant.");
*Gonzales*, 861 F. Supp. 2d at 1107 ("[A]n employee benefit plan under ERISA can
be comprised of more than one document." (citation omitted)).[4]  Plaintiff would have
this Court conclude that the shared term "Surviving Spouse" means fundamentally
different (and, indeed, flatly inconsistent) things as used in the Executive Plan and
the Pension Plan—even though eligibility for and the amount and timing of the
benefits she seeks under the Executive Plan are all determined with express reference

---

[4] *See also Hyman v. Nationwide Mut. Fire Ins. Co*., 304 F.3d 1179, 1186, 1188 (11th
Cir. 2002) (explaining that where terms are not "defined in the policy" the court
should "accord each its ordinary meaning" and "look at the policy as a whole and
give every provision its full meaning and operative effect."); *Vaught v. Scottsdale
Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008) ("In interpreting
the terms of an ERISA plan[,] we examine the plan documents as a whole and, if
unambiguous, we construe them as a matter of law." (quoting *Welch v. Unum Life
Ins. Co. of Am*., 382 F.3d 1078, 1082 (10th Cir. 2004))).

to the terms of the Pension Plan. The Court should reject Plaintiff's illogical interpretation, reach the same conclusion as the authorities cited herein, and dismiss Plaintiff's claims under the unambiguous language of the Executive Plan.

## II. Plaintiff's Interpretation Conflicts with the Pension Plan and Other Provisions of the Executive Plan.

The conflicts created by Plaintiff's divergent interpretation of "Surviving Spouse" only highlight that the term should be construed consistently across the Executive Plan and the Pension Plan that it was intended to supplement. As explained in Defendants' opening brief, Section 4.6 of the Executive Plan accounts for the surviving spouse benefit a participant has selected in the event Coca-Cola experiences a "Change in Control" before the entitlement to those benefits has vested.  Dkt. 8-1 at 17–18.

But Section 4.6 of the Executive Plan expressly provides that "the related monthly life-only survivor benefit which would be payable under Section 4.4 [of the Executive Plan] to the person, if any, who is [the Participant's] spouse on the date his employment terminated" is only available if "he remains married to such spouse until his death, [and] such spouse survives him and actually receives a benefit from a Qualified Pension Plan in the form of a 100 percent joint and surviving spouse payment."  Dkt. 1-1 at 16–17 (§ 4.6(d)(2)(C)).

Plaintiff disregards that this conflicts with her reading of Section 4.4 by quipping that she is not seeking benefits under Section 4.6, but that only ignores the

point.  Opp. at 17–18.  The plain text of the Executive Plan makes clear that a "Surviving Spouse" must be the same person under the Pension Plan and the Executive Plan, and details that, to receive a benefit under either Plan, this singular person must (a) have been married to the participant at the time his benefit accrued under the Pension Plan, (b) remain married to him until the time of his death, and (c) be entitled to actually receive a surviving spouse benefit under the Pension Plan.

Under Plaintiff's interpretation, a "spouse at death" like Ms. Gervait would qualify for the "Surviving Spouse" benefit due under Section 4.4 of the Executive Plan, but she would not qualify for the exact same "related monthly life-only survivor benefit which would be payable under Section 4.4" of the Executive Plan in the event of a "Change in Control" because she could meet none of the conditions set forth in Section 4.6.  Dkt. 1-1 at 15–17 (§ 4.6(d)(2)(C)).  Ms. Gervait was not Mr. Teasley's spouse when his employment terminated and Ms. Gervait concedes that she could never have "actually receive[d] a benefit from a Qualified Pension Plan in the form of a 100 percent joint and surviving spouse payment."  *Id.* at 17.  Plaintiff's proposed reading either creates internal conflicts between the different provisions of the Executive Plan (Sections 4.4 and 4.6) or it renders the detailed requirements of Section 4.6 superfluous, and neither option is consistent with the bedrock principles of contract interpretation.  *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 742 (11th Cir. 2024) ("A contract should be interpreted to

give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.") (internal quotations and citations omitted).

And the problems with Plaintiff's interpretation are not merely academic. While Plaintiff sees no issue with there being two different "Surviving Spouses"— one under the terms of the Pension Plan (Mrs. Teasley) and another under the terms of the Executive Plan (Ms. Gervait)—this approach cannot be reconciled with how those benefits are actually calculated in the first instance. When Mr. Teasley retired in 1996 and designated Mrs. Teasley as his Surviving Spouse, her age and life expectancy informed the actuarial assumptions that were used to calculate the benefits payable under both the Pension Plan and the Executive Plan. *See* Compl. ¶ 17; Dkt. 1-4 (calculating a combined monthly benefit of $34,648.19 for Mr. and Mrs. Teasley due under the Pension Plan and Executive Plan beginning as of April 1, 1996); *see also* Dkt. 8-2 at 503 (Appendix D, "Actuarial Equivalent Factors for the 100% Joint and Survivor Annuity"). Consistent with these assumptions, Coca-Cola paid Mr. Teasley more than $11 million in benefits under both Plans until he passed away some 27 years later. And, if Mrs. Teasley had not predeceased Mr. Teasley, she would have been entitled to continue receiving those benefits for the remainder of her life as his Surviving Spouse under the terms of both Plans. *See* Dkt. 1-1 at 14 (§ 4.4); Dkt. 8-2 at 50–51 (§ 7.2(b)(4)).

10

In this case, Plaintiff nevertheless contends that Coca-Cola should continue to pay her the bulk of those benefits for the remainder of her life, although the benefits were calculated based on actuarial assumptions that Coca-Cola made about Mrs. Teasley in 1996, when Mr. Teasley retired and designated her as his Surviving Spouse under both Plans. *See* Compl. ¶ 17; Dkt. 1-4. And this is precisely why participants like Mr. Teasley are expressly precluded from changing their Surviving Spouse election after benefits have been calculated and payments have commenced. Dkt. 8-2 at 35 ("The Participant's Spouse as of the Participant's Benefit Commencement Date shall continue to be the Participant's Spouse for purposes of this Plan . . .  notwithstanding the subsequent death or divorce of such Spouse and the remarriage of the Participant"); *id.* at 62 (§ 7.12 "A Participant may elect a Joint Annuitant at any time during the period beginning 180 days prior to the Benefit Commencement date and ending on the Benefit Commencement Date. . . . An election of a Joint Annuitant outside the time period described above shall be void."). It is also why the Eleventh Circuit has already recognized that the "survivor annuity benefits [that ERISA-governed pension plans must provide under 29 U.S.C. § 1055] are only available to a spouse who was married to the participant when the annuity payments began." *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 841 (11th Cir. 2006). Indeed, the Eleventh Circuit reached that conclusion in an ERISA top-hat case that involved the same type of surviving spouse benefit at issue here and an

11

indistinguishable fact pattern.  *See Holloman*, 443 F.3d at 841–42 (holding that "because the participant had to request the [joint and survivor benefit option] in advance [of when he retired and the annuity payments began] and because the amount of the reduced payments [payable under this option] would be calculated based on the joint life expectancy of the participant and his spouse [at that time] the terms of the plans plainly indicated that only the participants' spouse at the time of the election would be eligible to receive survivor benefits" and rejecting a claim made by a second spouse, who married the participant after the his first spouse, identified at the time of his election, predeceased him.).  This Court should reject Plaintiff's request that it ignore this binding precedent, turn a blind eye to the plain language of the Executive Plan, and disregard the practical realities that informed both.

### III. The Unambiguous Terms of the Executive Plan Foreclose Plaintiff's Equitable Estoppel Claim, and Her Reliance on a Stray Email Cannot Override the Committee's Discretion.

Despite the unambiguous terms of the Executive Plan, Plaintiff continues to invoke equitable estoppel as an alternative claim.  Opp. at 22.  But as explained in Defendants' opening brief, that "very narrow" doctrine is not available where the relevant plan terms are unambiguous.  Dkt. 8-1 at 18–20.  Because Plaintiff is not a "Surviving Spouse" under the plain terms of the Executive Plan, her equitable estoppel claim fails as a matter of law, and the Court can conclude its analysis there.

If the Court nonetheless determines the term is ambiguous and denies Defendants' motion, this case will focus on the Benefit Committee's 2024 denial of Plaintiff's administrative claim for benefits and the appeal that followed. *See* Compl. ¶¶ 9, 35–38. Under the terms of the Executive Plan, the Committee is granted discretionary authority "to construe the Plan and to decide all questions arising under the Plan", including "the eligibility of Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan." Dkt. 1-1 at 22–23; *see also id.* at 43 (delegating administration to The Coca-Cola Company Benefits Committee). Plaintiff's Opposition seeks to override that deference (and ignore the definitive interpretation that the Benefits Committee gave in 2024) based upon an email Mr. Teasley received from a human resources employee in 2011, but that communication was not a "plan interpretation"—much less the guarantee of extra-contractual benefits that Plaintiff seeks to have this Court impose. Opp. at 22–23.[5]

---

[5] Indeed, as explained in Defendants' opening brief, because the administrative record of the Benefit Committee's interpretation of the Executive Plan is not yet before this Court, any ruling related to the Committee's discretion or its determination would be premature. *See* Dkt. 8-1 at 20, n.5. Thus, in the event the Court determines that the Executive Plan is ambiguous, it should end the analysis there and review the Committee's interpretation of the Plan with the deference required under controlling Eleventh Circuit law. *Id.* ("As long as a reasonable basis appears for [Defendant's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." (citing *White v. The Coca-Cola Co.,* 542 F.3d 848, 856 (11th Cir. 2008))).

The March 2011 email merely paraphrased the language of the Executive Plan and then noted that Mr. Teasley had elected Mrs. Teasley as his Surviving Spouse back in 1996.  It did not include any analysis (let alone an interpretation confirming) that Plaintiff was indeed a "Surviving Spouse" under the Executive Plan.  Dkt. 1-2 at 2 (stating simply: "Your spouse at death is entitled to 100% of the benefit under the Key [Executive] Plan"; not predicting, as Plaintiff asserts, that she was that spouse or that she would be entitled to a benefit under the Executive Plan if Mr. Teasley did in fact marry and then predecease her).  Plaintiff's assertion that a December 2011 email is "extrinsic evidence" of "Coca-Cola's act of changing in the system [Mr. Teasley]'s spousal beneficiary under the Executive Plan" that the Court should give "'much' if not 'conclusive' weight" is similarly overblown.  *See* Opp. at 17–19, 26–27.  The December 2011 email reflects that a Coca-Cola human resources employee simply passed along Plaintiff's information to a vendor at Mr. Teasley's request.[6]  *See* Dkt. 1-3 at 2.  In short, neither of Plaintiff's ministerial

---

[6] This is distinct from *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir. 1990), where the insurance carrier for Bell Southern's health plan verbally confirmed coverage both to the participant and the healthcare provider before later deciding to deny coverage.  *Id.* at 1284.  Similarly, in *National Companies Health Benefit Plan*, 929 F.2d 1558 (11th Cir. 1991), a long-since abrogated decision, the plan sponsor provided the plaintiff with a written memorandum specifically representing that he would be entitled to continued coverage, accepted his premium payments for continued coverage, and later denied he was eligible for continued coverage.  *Id.* at 1574.  Plaintiff here received no confirmation of coverage from Coca-Cola or the vendor, verbal or otherwise.

emails from a human resources employee was a "representation that [Plaintiff] would receive benefits under the Executive Plan" (Compl. ¶¶ 26–27)—let alone were they an interpretation by the Benefits Committee that is vested with discretionary authority to interpret the Executive Plan. Accordingly, neither can be the basis for an equitable estoppel claim under settled law. *See Klaas*, 21 F.4th at 768; *Katz v. Comprehensive Plan of Grp. Ins.*, 197 F.3d 1084, 1090 (11th Cir. 1999); *Holloman*, 443 F.3d at 837.[7]

## CONCLUSION

For the reasons set forth above, the Court should dismiss Plaintiff's Complaint for failure to state a claim. Pursuant to Local Rule 7.1E, Defendants request that the Court order this Motion be heard by oral argument.

Dated: September 23, 2025

/s/ *Darren A. Shuler*
Darren A. Shuler
Georgia Bar No. 644276
dshuler@kslaw.com
Elliott Foote
Georgia Bar No. 562482
efoote@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street NE

---

[7] Plaintiff quips that *Holloman* "wasn't even an estoppel case", but this misses the point. Opp at 21. Because the Eleventh Circuit determined in *Holloman* that "survivor annuity benefits are only available to a [first] spouse who was married to the participant when the annuity payments began", the Court had no need to separately analyze plaintiffs' allegations that the employer had twice "assured the Hollomans that [the second spouse] would receive the same benefits that [the first spouse] was to have received" under the terms of the plan. *See* 443 F.3d at 835, 841.

Atlanta, GA 30309-3521
T: 404-572-4600
F: 404-572-5100

*Counsel for Defendants The Coca-Cola Company and The Coca-Cola Benefits Committee*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1D, the undersigned certifies that the foregoing complies with the font and point selections permitted by L.R. 5.1B.  This memorandum was prepared on a computer using the Times New Roman font (14 point).

Respectfully submitted, this 23rd day of September, 2025.

/s/ *Darren A. Shuler*
Darren A. Shuler
Georgia Bar No. 644276

*Counsel for Defendants The Coca-Cola Company and The Coca-Cola Benefits Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of September, 2025, I electronically filed the above and foregoing with the Clerk using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/ *Darren A. Shuler*
Darren A. Shuler
Georgia Bar No. 644276

*Counsel for Defendants The Coca-Cola Company and The Coca-Cola Benefits Committee*